UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| ANTHONY ZEOLI, | ) |
| | ) |
| Plaintiff, | ) |
| | ) Case No. 1:25-cv-02358 |
| v. | ) |
| | ) Judge Sharon Johnson Coleman |
| SIGNATURE FEDERAL CREDIT UNION, | ) |
| | ) |
| | ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**

Plaintiff, Anthony Zeoli ("Plaintiff") filed suit against Defendant, Signature Federal Credit Union ("Defendant") alleging six counts: two violations of the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA"), 815 ILCS 505/2, *et seq.* (Counts I and II), two common law fraud claims (Counts III and IV), and two breach of contract claims (Counts V and VI) stemming from credit line agreements with Defendant. Defendant filed a renewed Motion to Dismiss[1] ("Motion") all of Plaintiff's claims, except for his breach of contract claims, pursuant to Federal Rule of Civil Procedure 12(b)(6). For the reasons set forth below, the Court denies Defendant's Motion [20].

**BACKGROUND**

On a motion to dismiss under Rule 12(b)(6), the Court accepts the complaint's well-pleaded factual allegations, with all reasonable inferences drawn in the non-moving party's favor. *See Smoke Shop, LLC v. United States*, 761 F.3d 779, 785 (7th Cir. 2014). Unless otherwise noted, the following factual allegations are taken from Plaintiff's Second Amended Complaint ("Complaint"), (Dkt. 18),

---

[1] The Court strikes Defendant's first Motion to Dismiss, [12], as moot, based on Plaintiff's subsequent amendment to his pleadings.

1

and are assumed true for purposes of this Motion. *W. Bend Mut. Ins. Co. v. Schumacher*, 844 F.3d 670, 675 (7th Cir. 2016).

### A. The First Credit Line Agreement

In or around March 2023, Plaintiff submitted an application to Defendant for a home equity line of credit. On March 29, 2023, Defendant's "Home Equity Loan Processor," Melanie J. Pendarvis ("Pendarvis"), contacted Plaintiff requesting various documents and information needed in order to process his application. By May 18, 2023, Plaintiff sent all required documents and information Pendarvis requested to Jennifer E. Rivera-Alvarez ("Rivera-Alvarez"), Defendant's "Mortgage Coordinator."

On May 19, 2023, Rivera-Alvarez advised Plaintiff that his loan application had been approved. On May 24, 2023, Jamie Donald ("Donald"), Defendant's "Associate Manager [for] Home Equity Loans," sent Plaintiff his closing documents. On that same day, Plaintiff signed his closing documents and thereby entered into a Credit Line Account Variable Interest Rate Home Equity Secured Open-End Credit Agreement (the "First Credit Line Agreement") with Defendant. The First Credit Line Agreement, which was sent to Plaintiff by Donald, provides for an interest rate as follows:

> On the date Your Account is established, Your Account will be subject to a discounted Introductory Rate. FINANCE CHARGES will be computed using a Daily Periodic Rate of .007946%, corresponding to an **ANNUAL PERCENTAGE RATE** of 2.90%. This Introductory Rate will be in effect until 5/24/2033. If Your Account was not subject to this discounted Introductory Rate, Your Account would have been subject to a Daily Periodic Rate of .024658% corresponding to an **ANNUAL PERCENTAGE RATE** of 9.00%.

(Dkt. 18-1 at *2.)

When Plaintiff received his account statement from Defendant for the period of February 1-29, 2024, Plaintiff discovered that effective February 26, 2024, Defendant had changed the interest rate under the agreement for the First Credit Line from 2.90% to 9.50%, over nine years earlier than any increase in the interest rate should have taken effect. This caused an increase in the dollar amount

of interest from approximately $12.03 per day to $39.42 per day, or from approximately $4,390.95 per year to $14,388.30 per year.

Upon discovering that Defendant increased his interest rate as detailed above, Plaintiff contacted Defendant and requested a copy of his closing documents associated with, and including, the First Credit Line Agreement. In response to said request, an authorized agent of Defendant sent Plaintiff the requested closing documents. However, the agreement Plaintiff received from Defendant was not the same version Plaintiff signed the previous year. The agreement Plaintiff received from Defendant, which Plaintiff refers to as the "Forged First Credit Line Agreement," provided that the annual percentage rate of 2.90% would only be in effect until August 24, 2023, not until May 24, 2033, as provided in the version of the agreement Plaintiff signed.

Plaintiff asserts Defendant, by and through its authorized agents and employees, including but not limited to Pendarvis, Rivera-Alvarez, and Donald, made a number of representations to Plaintiff, before Plaintiff entered into the First Credit Line agreement, including a false promise that the interest rate for the First Credit Line would remain at 2.90% until May 24, 2033, despite never intending to honor that rate. Plaintiff additionally alleges that Donald, acting within the scope of his agency as an employee of Defendant, forged Plaintiff's initials on a second version of the First Credit Line agreement, which contains terms to which Plaintiff did not agree.

### B. The Second Credit Line Agreement

In or around August 2023, Plaintiff submitted another application to Defendant for a home equity line of credit. Plaintiff asserts he applied for this second home equity line of credit due to the favorable 2.90% interest rate Plaintiff secured in the First Credit Line Agreement but prior to discovering Defendant's unilateral increase and Donald's creation of the Forged First Credit Line Agreement.

On March 29, 2023, Defendant's "Mortgage Loan Processor," Jason J. Hong ("Hong"), contacted Plaintiff requesting various documents and information needed in order to process his application. On August 28, 2023, Plaintiff uploaded all of the documents and information Hong requested to Defendant's website portal. On August 31, 2023, Plaintiff began email correspondence with Defendant's "Mortgage Loan Processor," Chrystal Crawford ("Crawford"), and subsequently uploaded tax returns to Defendant's website portal as directed by Crawford.

Prior to Plaintiff's receipt of closing documents from Donald, Plaintiff secured a different home equity line with another credit union at a lower interest rate. Plaintiff terminated the other home equity line of credit when Hong and Crawford indicated such termination was required before the closing could proceed with Defendant. As a result of this termination, Plaintiff had to repay closing costs to the other credit union in the approximate amount of $745.25.

After providing the requisite paperwork and terminating his other credit line, on October 23, 2023, Plaintiff signed his closing documents and entered into a Credit Line Account Variable Interest Rate Home Equity Secured Open-End Credit Agreement with Defendant (the "Second Credit Line Agreement"). The agreement for the Second Credit Line, which was sent to Plaintiff by Donald, provides as follows:

> Your scheduled payment will be due monthly beginning 12/25/2023. You can obtain credit advances for 120 months (the "Draw Period"). During the Draw Period, Your Minimum Periodic Payment will be established and **fixed**: (a) at the time of each advance that is at least equal to $500.00; or (b) each time You make a payment that results in a reduction of at least $500.00 in the principal balance of Your loan. Your new Minimum Periodic Payment (including new payment amounts triggered by a principal reduction of at least $500.00) will be an amount sufficient to amortize Your then outstanding balance over the following 180 months at the then-current interest rate, subject to the lesser of $100.00 or Your Account balance.

(Dkt. 18-3 at *1). During the "Draw Period," on or about September 12, 2024, Plaintiff made a payment on the Second Credit Line in the amount of $8,975.32. Of that amount, Defendant attributed $7,387.73 to the principal balance of the loan and $1,587.59 to interest. Pursuant to the Second Credit

4

Line Agreement's language quoted above, Plaintiff's "new Minimum Periodic Payment" would be established at an amount sufficient to amortize Plaintiff's then outstanding balance over the following 180 months at the then-current interest rate. Amortizing the balance of $219,854.95 over the following 180 months at an interest rate of 8.500%, the Minimum Periodic Payment under the Second Credit Line agreement should have been approximately $2,165.00 per month going forward. However, as reflected in Exhibit 4, Defendant reset Plaintiff's Minimum Periodic Payment to $2,235.63 per month, a difference of approximately $70.63 per month, and approximately $12,713.40 over a period of 180 months.

Plaintiff asserts Defendant, by and through its authorized agents and employees, including but not limited to Hong, Crawford, and Donald, made a number of false representations to Plaintiff, before Plaintiff entered into the Second Credit Line Agreement, including a promise that the Minimum Periodic Payment for the Second Credit Line would be calculated in accordance with the Second Credit Line agreement language quoted above, despite never intending to honor that rate.

While Plaintiff continued making his payments under the Second Credit Line Agreement even after Defendant "unilaterally changed its terms," Plaintiff was compelled to make such payments in order to avoid negative consequences, including, but not limited to, late payments being reported on his credit reports by Defendant, proceedings to collect any unpaid balances, and the possibility of a foreclosure action being instituted against the secured property.

**LEGAL STANDARD**

A motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim tests the sufficiency of the complaint, not its merits. *See Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 736 (7th Cir. 2014). When considering dismissal of a complaint, the Court accepts well pleaded factual allegations as true and draws all reasonable inferences in favor of the plaintiff. *Erickson v. Pardus*, 551 U.S. 89, 94 (2007) (per curiam); *Trujillo v. Rockledge Furniture LLC*, 926 F.3d 395, 397 (7th Cir. 2019). To survive

a motion to dismiss, plaintiff must "state a claim to relief that is plausible on its face." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007).

**DISCUSSION**

In its Motion, Defendant argues Counts I – IV of the Complaint should be dismissed under Rule 12(b)(6) because: (1) Plaintiff has failed to allege any actionable fraud, and (2) Plaintiff has failed to plead fraud with the requisite particularity required under Rule 9(b). (Dkt. 21 at *3.)

**I.  ICFA Claims (Counts I and II)**

The ICFA, 815 ILCS 505/1, is a regulatory statute designed to protect consumers, borrowers, and businesspersons from fraud, unfair methods of competition, and other unfair and deceptive business practices. *Kahn v. Walmart*, 107 F.4th 585, 597 (7th Cir. 2024). To prevail on a claim under the ICFA, a plaintiff must establish: (1) a deceptive or unfair act or practice by the defendant; (2) the defendant's intent that the plaintiff rely on the deceptive or unfair practice; (3) the occurrence of the unfair or deceptive practice during a course of conduct involving trade or commerce; and (4) that the defendant's conduct proximately caused actual damages to the plaintiff. *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 646 (7th Cir. 2019). Because Plaintiff's ICFA and related claims are based in fraud, they are also subject to Rule 9's heightened pleading standard that requires a party alleging fraud to "state with particularity the circumstances constituting fraud." *See* Fed. R. Civ. P. 9(b). This "ordinarily requires the 'who, what, when, where, and how' of the fraud, although the exact level of particularity that is required will necessarily differ based on the facts of the case." *AnchorBank, FSB v. Hofer*, 649 F.3d 610, 615 (7th Cir. 2011) (citation omitted).

For the first element, a deceptive or unfair act or practice by the defendant, when determining whether conduct is "unfair" under the ICFA, courts consider: "(1) whether the practice offends public policy; (2) whether it is immoral, unethical, oppressive, or unscrupulous; [and] (3) whether it causes substantial injury to consumers." *Benson v. Fannie May Confections Brands, Inc.*, 944 F.3d 639, 647 (7th

Cir. 2019) (internal citations omitted). A plaintiff need not meet all three factors: rather, "[a] practice might be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three." *Id.* Alternatively, conduct is "deceptive" under the ICFA, "if it creates a likelihood of deception or has the capacity to deceive." *See Bober v. Glaxo Wellcome PLC*, 246 F.3d 934, 938 (7th Cir. 2001). Courts apply a "reasonable consumer" standard to analyze the likelihood of deception. *See Mullins v. Direct Digital, LLC*, 795 F.3d 654, 673 (7th Cir. 2015). "[W]hen analyzing a claim under the ICFA, the allegedly deceptive act must be looked upon in light of the totality of the information made available to the plaintiff." *Davis v. G.N. Mortg. Corp.*, 396 F.3d 869, 884 (7th Cir. 2005).

Defendant first argues the acts alleged by Plaintiff are insufficient to support a claim for consumer fraud. (*See* Dkt 21 at *6.) Defendant argues, it is settled that the ICFA was not intended to apply to every contract dispute or to supplement every breach of contract claim with a redundant remedy. *Id.* (citing *Law Offices of William J. Stogsdill v. Cragin Federal Bank for Savings*, 268 Ill. App. 3d 433, 437, 645 N.E.2d 564, 567 (1995)). Defendant asserts Plaintiff's claims are properly addressed through a breach of contract action because "a deceptive act or practice involves more than the mere fact that a defendant promised something and then failed to do it." (*See* Dkt 21 at *6.) (internal citations omitted). Next, Defendant argues Plaintiff fails to adequately plead proximate cause to support his ICFA claims because only statements made *before* the transactions could have caused the alleged damage. (Dkt 21 at *7.) Here, Defendant argues, the alleged statements made before the transaction, that Defendant promised the interest rate "would remain" at 2.9% for the Business Line and that the "Minimum Periodic Rate" "would be calculated in accordance with" the terms of the Home Equity Line, are statements of future intent that are not not actionable in fraud. (*See* Dkt 21 at *7-8.) Third, Defendant argues, to the extent Plaintiff invokes the ICFA for unfair practices, Plaintiff has not alleged substantial injury to consumers, and his conclusory claims of "outrageous" conduct cannot circumvent the economic loss doctrine, which bars recovery in tort for economic loss when

7

the parties' duties, as here, are contractual in nature (*Id.* at *7) (citing *Moorman Mfg. Co. v. National Tank Co.*, 91 Ill.2d 69, 435 N.E.2d 443 (1982)). Finally, Defendant argues Plaintiff's general conclusions, that contains mere "vague assertions" that authorized agents and employees made "a number of representations" to Plaintiff "about the nature of the agreement," fail to satisfy the Rule 9(b) pleading standard. (Dkt. 21 at *11) (citing *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737 (7th Cir. 2014)).

Plaintiff maintains Defendant made misrepresentations to Plaintiff that it would honor a favorable interest rate for the First Credit Line Agreement, *prior* to agreement, despite its intention to forge his signature and unilaterally change those terms. (*See* Dkt. 24 at *4-5.) Plaintiff also maintains that Defendant made misrepresentations to Plaintiff that it would honor a minimum payment rate for the Second Credit Line Agreement, *prior* to agreement, despite its intention to unilaterally change the payment rate. (*See* Dkt. 24 at *4-5.). Plaintiff believes these unilateral increases, and the forgery in particular, are more than enough to sufficiently allege an unfair or deceptive practice by the Defendant, and far more than a mere breach of contract. (Dkt. 24 at *8.).

Plaintiff also asserts he has alleged facts supporting all five elements required to sustain an IFCA claim, even under Rule 9(b)'s heightened pleading standard. (Dkt. 24 at *5.) Specifically, Plaintiff asserts that he describes every major action, from late March 2023 until September 2024, that led to the parties entering into both agreements, the circumstances which led to him discovering Defendant's alteration and forgery on the First Credit Line Agreement, the circumstances which led to him discovering Defendant's unilateral change to the Minimum Periodic Payment, and the names of the individuals involved, and all relevant communications. (Dkt. 24 at *19.)

Drawing all reasonable inferences in Plaintiff's favor, the Court agrees with Plaintiff that he has sufficiently alleged his ICFA claims, regardless of the heightened pleading standard. As an initial matter, Defendant's argument that Plaintiff's claims are barred by the economic loss or "*Moormon*

8


doctrine" is unavailing. Plaintiff explicitly alleges one of the recognized exceptions to the doctrine in his pleadings: that "plaintiff's damages are proximately caused by a defendant's intentional, false representation, i.e., fraud." *Wigod v. Wells Fargo Bank, N.A.*, 673 F.3d 547, 568 (7th Cir. 2012). Moving to the actual merits of his claims, the first element, a deceptive or unfair act or practice by the defendant, is shown through Plaintiff's allegation that Defendant unilaterally altered both Agreements and forged his signature in the First Credit Line Agreement. (Dkt. 24 at *6-7.) As to the second element, that a defendant intended a plaintiff to rely on a deceptive or unfair practice, Plaintiff has specifically alleged, and Defendant fails to contest, that Defendant intended Plaintiff to rely on their allegedly deceptive practices. Similarly, the third element, the occurrence of the unfair or deceptive practice during a course of conduct involving trade or commerce, is uncontested since securing a home equity line of credit involves trade and commerce. As to the final element, whether a defendant's conduct proximately caused actual damage to the Plaintiff, the Court also finds Defendant's arguments unavailing. Defendant does not appear to contest that Defendant sustained damages as a result of its actions, evidenced through increased interest from approximately $4,390.95 per year to $14,388.30 for the First Credit Line Agreement, $745.25 in closing costs to the competing credit union, and an additional $12,713.40 in interest over the life of the Second Credit Line Agreement. Instead of contesting these damages, Defendant argues that its actions were not the "proximate cause" of Plaintiff's damages the alleged misrepresentations did not occur *before* the transactions at issue. This assertion is directly contradicted, however, by Plaintiff's assertion that he was induced to enter into the agreements based on the favorable credit terms Defendant presented to him at the time of contracting that it *never* intended to honor. (*See* Dkt. 18 at *6, 11.) At this stage, the Court must accept Plaintiff's claims that he entered the contract and sustained damages based on Plaintiff's misrepresentations prior to or at the time of contracting.

Finally, the Court determines that Plaintiff has pled his ICFA claim with sufficient particularity to meet Rule 9(b)'s heightened pleading standard. Plaintiff has provided numerous details regarding which of Defendant's agents misrepresented the loan terms, when all correspondence occurred, where the correspondence occurred, and how those misrepresentations induced him to enter the Agreements. These details are more than sufficient to meet the heightened pleading standard. *See AnchorBank*, 649 F.3d at 615. Defendant's reliance on *Camasta*, to argue Plaintiff has not met this standard, is also unavailing. In *Camasta*, the plaintiff argued that the precise details of misleading advertisements that led him to purchase a product were "irrelevant," when he pleaded on "information and belief" that the defendant used false advertising. *Camasta v. Jos. A. Bank Clothiers, Inc.*, 761 F.3d 732, 737–38 (7th Cir. 2014). Unlike the present case, *Camasta* merely provided a sales receipt to substantiate his assertion that he was misled by supposed advertisements. (*Id.*) Here, where Plaintiff provided painstaking details on who induced him into the Agreements, who forged his signature, how he was induced to cancel an alternative loan that was more favorable, and who at Defendant altered the terms of his agreements, the Court will not dismiss Plaintiff's claims.

Accordingly, the Court denies Defendant's Motion to Dismiss Plaintiff's ICFA claims. Since the Court concludes that Plaintiff has pled every detail supporting his claims to the level of particularity required by Rule 9(b)'s heightened pleading standard, the Court will not address whether it should apply the Seventh Circuit's position and relax the pleading standard when some of the details are within the defendant's "exclusive knowledge.'" *See Jepson, Inc. v. Makita Corp.*, 34 F.3d 1321, 1328 (7th Cir. 1994).

## II. Common-Law Fraud Claims (Counts III and VI)

Defendant next argues that Plaintiff has not met the more stringent burden to establish his common law fraud claims. (*See* Dkt 21 at \*8.) In Illinois, "[t]he elements of common law fraud are: (1) a false statement of material fact; (2) defendant's knowledge that the statement was false; (3)

10

defendant's intent that the statement induce the plaintiff to act; (4) plaintiff's reliance upon the truth of the statement; and (5) plaintiff's damages resulting from reliance on the statement." *Squires-Cannon v. Forest Pres. Dist. of Cook Cnty.*, 897 F.3d 797, 805 (7th Cir. 2018) (internal citations omitted). It is well established that "[a]n omission or concealment of a material fact in the conduct of trade or commerce constitutes consumer fraud." *Connick v. Suzuki Motor Co.*, 174 Ill. 2d 482, 496, 675 N.E.2d 584, 595 (1996).

Defendant argues its actions, breaking future promises to honor the contractual rates, are not actionable in fraud. (Dkt. 21 at *8.) Specifically, Defendant emphasizes that to support a claim of fraud, any alleged misrepresentation must be of preexisting or present facts, not future conduct. (Dkt. 20 at *10) (citing *Ault v. C.C. Servs., Inc.*, 232 Ill. App. 3d 269, 271, 597 N.E.2d 720, 722 (1992)). Defendant argues Plaintiff's allegations, misrepresentations of future conduct as to what Defendant "would" do —namely, that the interest rate for the Business Line "would remain" at 2.90% and that the Minimum Periodic Payment for the Home Equity Line "would be calculated in accordance with" the contract—do not constitute fraud claims. Defendant also argues that Plaintiff's claims do not fit within the exception to the "future conduct" rule because Plaintiff has not alleged a scheme to defraud, or as Defendant describes, actions that "involve multiple statements of false promises, made at different times, and to different people." (Dkt. 20 at *10.) (citing *HPI Health Care Servs., Inc. v. Mt. Vernon Hosp., Inc.*, 131 Ill. 2d 145, 169, 545 N.E.2d 672, 683 (1989)) Finally, Defendant argues that Plaintiff's own pleadings contradict his allegations as to the First Credit Line Agreement because Plaintiff attached an account summary as Exhibit 4 to his Complaint, showing that Defendant did in fact charge him the very interest rate sought by Plaintiff (i.e., 2.9%). *Id.*

Plaintiff maintains that he has alleged his common law fraud claims with sufficient particularity. Plaintiff asserts the facts alleged in *Ault* are "quite different" than those alleged by Plaintiff. (Dkt 24 at *11.) Specifically, the plaintiff in *Ault* alleged that she entered into an employment

11

agreement based upon the defendant's representations that another of its employees would be terminated and that she would be assigned the terminated employee's accounts—a broken "promise." (*See id.*) Plaintiff, by contrast, alleges he was induced to enter into the First Credit Line, only for Defendant to subsequently alter the document, forge his signature, and apply a much higher interest rate and induced into the Second Credit Line, only for Defendant to unilaterally increase the Minimum Periodic Payment; he explicitly alleges preexisting and present misrepresentations Defendant made and that Plaintiff *never* intended to honor the terms it offered to Plaintiff. (*See id.*) Finally, regarding the September 30, 2024, statement attached to Plaintiff's Complaint as Exhibit 4 (Dkt. 18-4), Plaintiff explains, and Defendant omits, that Defendant only lowered the interest rate back to 2.90% when the Plaintiff uncovered its "scheme" and sent a letter from counsel asking Defendant to preserve evidence related to this matter. (Dkt. 24 at *9.)

Again, the Court agrees with Plaintiff that he has sufficiently alleged his common law fraud claims. As to the first element, a false statement of material fact by Defendant, Plaintiff specifically alleges Defendant made misrepresentations and concealed material facts about its intention to increase the interest rate and minimum payments under the Agreements, forged his signature, unilaterally changed the terms of the Agreements, and never intended to honor the contractual terms in either Agreement. As to the second element, defendant's knowledge that the statements and omissions were false, Defendant does not contest Plaintiff's assertion that it never intended to honor the favorable terms it utilized to induce Plaintiff to sign the Agreements. As to the third element, defendant's intent that the statements and omissions induced plaintiff to act, Plaintiff specifically alleges Defendant induced him into the First Credit Line Agreement with favorable terms it never intended to honor and induced him into the Second Credit Line Agreement while omitting its forgery and unilateral changes to the First Agreement. As to the fourth element, Plaintiff's reliance upon the truth of the statements and omissions, Plaintiff alleges he was induced to enter the Agreements and cancel his

12

agreement with another creditor because of favorable terms Defendant presented to him. And as to the fifth element, damages resulting from reliance on the statements and omissions, the Court reiterates that this is evidenced through: increased interest from approximately $4,390.95 per year to $14,388.30 for the First Credit Line Agreement, $745.25 in closing costs to the competing credit union, and an additional $12,713.40 in interest over the life of the Second Credit Line Agreement.

The Court additionally agrees with Plaintiff, that his allegations are materially distinct from the allegations contemplated in *Ault*. While the Plaintiff in *Ault* alleged the defendants broke their future promise to fire a different employee, 232 Ill. App. 3d at 271, 597 N.E.2d at 722, in the present case, Plaintiff alleges forgery, unilateral changes to contract terms, omission of unilateral changes by Defendant, and most importantly, offering of terms that Defendant *never* intended to honor. These allegations reach far beyond the mere broken promise contemplated in *Ault*; they include specific allegations of material misstatements of preexisting or present facts that the *Ault* court believed the plaintiff was missing. *But see id.* ("plaintiff has alleged broken promises by the defendant rather than material misstatements of fact.") Ultimately, because Plaintiff has shown all elements, based on "omission[s] or concealment of a material fact[s] in the conduct of trade or commerce, he has plausibly alleged common-law fraud. *See Connick*, 174 Ill. 2d at 504, 675 N.E.2d at 595.

In the alternative, even if Plaintiff did not properly allege that his claims stemmed present or preexisting conduct—and for any avoidance of doubt the Court believes he has—at minimum, his claims satisfy the *Roda* exception. Under this exception, Illinois courts allow plaintiffs to sustain a claim for fraud "where the false promise or representation of intention or of future conduct is the scheme or device to accomplish the fraud." *Roda v. Berko,* 401 Ill. 335, 340, 81 N.E.2d 912, 915 (1948). Defendant relies on *HPI* to argue such a scheme must involve "multiple statements of false promises, made at different times, and to different people." (Dkt. 21 at *10.) In *HPI*, the court allowed the plaintiff's claims to survive when it listed each of the exact false promises made to the plaintiff and

13

the dates on which each of these false promises were made in sufficient detail. *HPI.*, 131 Ill. 2d at 169, 545 N.E.2d at 683. Importantly, *HPI* is silent as to whether the scheme needs to be directed at "multiple people," like Defendant asserts. Here where Plaintiff alleges Defendant misrepresented loan terms, forged his signature, omitted its unilateral changes, and induced him into a second Agreement despite these actions, Plaintiff has alleged repeated and numerous knowingly false promises as to sustain his action.

Under the general rule and under any necessary exception, the Court determines that Plaintiff sufficiently alleges his common law fraud claims with sufficient particularity.

**CONCLUSION**

For the foregoing reasons, Defendant's Motion to Dismiss Counts I - IV of Plaintiff's Second Amended Complaint [20] is denied. All of Plaintiff's claims, including the breach of contract claims Defendant did not move to dismiss, remain.

**IT IS SO ORDERED.**

Date: 2/25/2026

Entered: _____
SHARON JOHNSON COLEMAN
United States District Judge

14